CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
**May 14, 2025**
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| John Doe, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:25-cv-00023 |
| | ) | |
| Kristi Noem, in her official capacity as | ) | |
| Secretary of Homeland Security, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

John Doe[1] is a full-time international student currently enrolled in a graduate program

at the University of Virginia.  He has filed a complaint for declaratory and injunctive relief

against Kristi Noem, in her official capacity as Secretary of Homeland Security, the

Department of Homeland Security ("DHS"), and Todd Lyons, in his official capacity as Acting

Director of U.S. Immigration and Customs Enforcement ("ICE"), alleging that Defendants

unlawfully terminated records of his F-1 nonimmigrant student status in the Student and

Exchange Visitor Information System ("SEVIS").  On April 17, 2025, this court entered an *ex*

*parte* temporary restraining order, which (1) enjoined Defendants from terminating Doe's F-1

status under SEVIS, (2) ordered that Defendants' prior termination of his F-1 status and

SEVIS record shall have no legal effect, and (3) enjoined Defendants from arresting or

detaining Doe, transferring him out of this court's jurisdiction, removing him from the United

---

[1] On April 17, 2025, the court granted Doe's motion for leave to proceed under a pseudonym in all public filings in this matter, as well as his motion to file certain exhibits under seal.  (Dkt. 7.)  Doe later filed sealed, unredacted versions of those exhibits that disclose his name, date of birth, and country of origin.

States, or taking any other action as the result of the decision to terminate records of his F-1 status under SEVIS.

This matter is now before the court on Doe's motion for a preliminary injunction (Dkt. 5). The parties have fully briefed the motion, and the court held a preliminary injunction hearing on May 1, 2025. That same day, the court extended the temporary restraining order for a period of fourteen days. For the reasons stated below, the court will grant a preliminary injunction.

## I.    Background and Findings of Fact[2]

### A. Nonimmigrant F-1 Status and SEVIS

Under the Immigration and Nationality Act ("INA"), an international student may obtain an F-1 visa to enter the United States for the purpose of pursuing a full course of study at an approved academic institution. 8 U.S.C. § 1101(a)(15)(F)(i). To gain admission to the United States, the student must present a Form I-20 issued by a school certified by DHS's Student and Exchange Visitor Program ("SEVP"). 8 C.F.R. § 214.2(f)(1)(i).

Schools must issue the Form I-20 via SEVIS, which is a centralized database that DHS uses to monitor students with F-1 status. *See id.* § 214.2(f)(1)(iii); DHS, *About SEVIS*, Study in the States, https://perma.cc/49RX-SHX5. SEVP updates, maintains, and terminates student information in SEVIS "to carry out the purposes of the [F-1] program." (Decl. of Andre Watson ¶ 4 (Dkt. 16-1).) Schools certified by SEVP must maintain records for students

---

[2] In addition to summarizing the relevant statutory and regulatory framework, this section contains findings of fact the court has relied on to resolve Doe's motion for a preliminary injunction. The findings of fact are derived from Doe's complaint, the declarations and exhibits Doe attached to his motion for a preliminary injunction, the declaration and exhibits Defendants have filed in response to Doe's motion, and the supplemental filings the parties have submitted at the court's direction.

with F-1 status and use SEVIS to report certain changes in information that affect students' status.  8 C.F.R. § 214.3(g).  While designated school officials ("DSOs") can access student records on SEVIS, *see id.*, students do not have direct access to SEVIS or any other database that allows them to confirm their status.  (*See* Defs.' Suppl. Filing in Resp. to the Ct.'s Questions at the Hr'g on the Mot. for Prelim. Inj. at 1 (Dkt. 28) [hereinafter "Defs.' Suppl. Filing"].)

An international student who is granted F-1 status may remain in the country for their "[d]uration of status"—that is, as long as they meet the conditions established by the regulations governing the F-1 classification.  8 C.F.R. § 214.2(f)(5)(i).  First and foremost, the student must maintain a full course of study or receive authorization to participate in "practical training" after completing their studies.  *Id.*  When a student completes their course of study and any authorized practical training, they generally have 60 days to prepare to depart the United States or transfer to another approved school.  *Id.* § 214.2(f)(5)(iv).

A student may fail to maintain their F-1 status by engaging in certain prohibited activities specified by regulation, which include unauthorized employment, willfully failing to provide full and truthful information to DHS, and "[c]riminal activity."  *Id.* § 214.1(e)–(g).  "Criminal activity" constitutes a failure to maintain lawful status only when it results in a "conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed)."  *Id.* § 214.1(g).  The revocation of an F-1 visa does not constitute a failure to maintain status under these regulations.  *See* ICE Policy Guidance 1004-04 – Visa Revocations (June 7, 2010), https://perma.cc/ZM2S-R6Z6 ("Some circumstances require

revocation of a nonimmigrant student's visa while the nonimmigrant is in the United States and in status. Visa revocation is not, in itself, a cause for termination of the student's SEVIS record."). In other words, once a student is lawfully present in the United States, their F-1 status is not dependent on their F-1 visa.

If a student does not engage in conduct that constitutes a failure to maintain status, DHS may terminate the student's status in three specific circumstances: (1) a waiver previously authorized on the student's behalf under 8 U.S.C. § 1182(d)(3) or (4) is revoked; (2) a private bill is introduced in Congress to confer lawful permanent residence status; or (3) a notification is published in the Federal Register that identifies national security, diplomatic, or public safety reasons for terminating F-1 status. 8 C.F.R. § 214.1(d). "DHS cannot otherwise unilaterally terminate nonimmigrant status." *Isserdasani v. Noem*, No. 25-cv-283, 2025 WL 1118626, at *2 (W.D. Wis. Apr. 15, 2025) (citing *Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 185 n.100 (3d Cir. 2019)).

A student who fails to maintain F-1 status is not afforded any period to prepare for departure from the United States. *See* 8 C.F.R. § 214.2(f)(5)(iv). In some limited circumstances, a student who fails to maintain status may submit a request for reinstatement of status. *Id.* § 214.2(f)(16)(i). A decision denying a student's reinstatement request is not appealable. *Id.* § 214.2(f)(16)(ii).

**B. Termination of Doe's SEVIS Record**

Doe is a citizen and national of a country in Latin America.[3]  (Compl. ¶ 25 (Dkt. 1).)
Since the fall of 2024, he has been enrolled as a full-time student in a graduate program at the
University of Virginia.  (Decl. of Doe ¶¶ 3, 12 (Dkt. 5-3).)  Beginning in 2009, Doe has lawfully
visited the United States several times.  (*See id.* ¶¶ 6–9.)  He first visited the United States in
June 2009 on a tourist visa.  (*Id.* ¶ 6.)  In the summer of 2010, he attended an English language
course in Massachusetts on an F-1 student visa.  (*Id.* ¶ 7.)  In January 2014, Doe entered the
United States with an F-1 student visa to attend an undergraduate program at a public
university in the Midwest.  (*Id.* ¶ 8; Compl. ¶ 25.)  He graduated from that program in
December 2015 with a Bachelor of Arts in Economics.  (Decl. of Doe ¶ 9.)  Doe's most recent
F-1 visa was issued in 2017.  (*Id.* ¶ 11.)  It was set to expire in July 2029.  (Pl.'s Ex. C at 2 (Dkt.
5-5).)

On April 4, 2025, the University of Virginia notified Doe that his status in SEVIS had
been changed to "TERMINATED" as of that same date.  (Decl. of Doe ¶ 14; *see* Decl. of Seth
Hall ¶¶ 3–5 (Dkt. 5-4).)  The "TERMINATION REASON" provided in SEVIS read:
"OTHERWISE FAILING TO MAINTAIN STATUS – Individual identified in criminal
records check and/or has had their VISA revoked.  SEVIS record has been terminated."
(Decl. of Seth Hall ¶ 3.)

SEVP made this update to Doe's SEVIS record based on information from a criminal
history database showing that Doe had a charge for battery in August 2015, which was

---

[3] Doe's public filings in this case do not identify his country of citizenship but state that it is not El Salvador.  (Compl.
¶ 25.)

ultimately expunged in 2024.  (Decl. of Andre Watson ¶¶ 7–8.)  Doe explains that the charge

arose from an incident that occurred while he was an undergraduate student in the United

States.  (Decl. of Doe ¶ 4.)  He reports that he was arrested on suspicion of violating a

municipal battery ordinance, which carried a maximum 180-day jail term, after he was assaulted

at a college bar.  (*Id.*; Compl. ¶ 33.)  Doe asserts that he acted in self-defense, he pled not

guilty, and the charges were dismissed.  (Decl. of Doe ¶ 4.)  A local judge signed an

expungement order on April 16, 2024.  (*Id.*)  Aside from that expunged charge, Doe has no

criminal history.  (Compl. ¶ 33.)  He states that he has truthfully disclosed the 2015 incident

in every one of his interactions with immigration officials and that the government knew about

the incident when it issued his most recent F-1 visa in 2017.  (*Id.* ¶ 34; Decl. of Doe ¶¶ 10–

11.)

    As of April 4, 2025, no government official had informed Doe that his visa had been

revoked.  (Decl. of Doe ¶ 16.)  Doe had travelled internationally as recently as March 2025

and re-entered the United States without incident on March 13, 2025.  (*Id.* ¶ 13.)

    On April 10, 2025—six days after he learned about the termination of his SEVIS

record—Doe received an email from the U.S. Department of State's Bureau of Consular

Affairs Visa Office.[4]  (*Id.* ¶ 15; Pl.'s Ex. C at 2.)  The email began by stating that Doe's F-1

visa "ha[d] been revoked" based on "additional information [that] became available after [his]

visa was issued."  (Pl.'s Ex. C at 2.)  It did not elaborate on what that "additional information"

was.  The email then continued:

---

[4] The email was signed by the Consular Section of the U.S. Embassy in a Latin American country that was not Doe's
country of origin.  (*See* Compl. ¶ 30; Pl.'s Ex. C at 2.)

The Bureau of Consular Affairs Visa Office has alerted the Department of Homeland Security's Immigration and Customs Enforcement, which manages the Student Exchange Visitor Program and is responsible for removal proceedings. They may notify your designated school official about the revocation of your F-1 visa.

Remaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation. It may also make you ineligible for a future U.S. visa. Please note that deportation can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the United States. Persons being deported may be sent to countries other than their countries of origin.

Given the gravity of this situation, individuals whose visa was revoked may wish to demonstrate their intent to depart the United States using the CBP Home App . . . .

(*Id.*)

According to Defendants, the Department of State revoked Doe's visa on April 4, 2025, the same day SEVP terminated his SEVIS record. (Defs.' Mem. in Opp'n to Doe's Mot. for Prelim. Inj. at 5 (Dkt. 16) [hereinafter "Defs.' Mem."].) Defendants have represented that the Department of State informed them that the revocation was "prudential," meaning that it does not render Doe removable. (*Id.* at 2–3; *see* Defs.' Suppl. Filing at 1–2.) However, Defendants have not submitted any documentation confirming that Doe's visa was revoked, when the revocation occurred, or that it was prudential in nature. The evidence in the record indicates that DHS did not learn about the revocation until April 16, 2025. (*See* Decl. of Andre Watson ¶ 9.) To date, DHS has not initiated removal proceedings against Doe. (Compl. ¶ 35.)

Doe reports that he is unable to attend in-person classes for his graduate program due to the termination of his SEVIS record and the resulting uncertainty about his F-1 status. (Decl. of Doe ¶ 21.) He states that this disruption will negatively affect his attendance and grades and place him at risk of losing his partial-tuition scholarship. (*Id.*). Doe took out

substantial loans to pay for the graduate program, and he explains that losing access to the program will place him "in an extremely difficult financial and academic position." (*Id.*) He explains that his "entire academic identity is rooted in the path [he has] built here in the United States, and the possibility of losing that feels overwhelming and deeply unsettling." (*Id.* ¶ 18.)

In addition to the actual and threatened academic consequences, Doe reports that he has struggled to find a summer internship, which is an integral part of his graduate program, due to Defendants' actions. (*Id.* ¶ 22.) He notes that he will lose the career-development opportunities his graduate program provides if he is forced to leave the United States, which will harm his professional career. (*Id.* ¶ 23.)

Doe also states that he is experiencing high levels of stress and anxiety due to the uncertainty about his legal status. (*Id.* ¶¶ 17, 24.) He fears that the loss of his F-1 status will result in his detention and deportation, potentially to a place other than his country of origin, as warned by the Bureau of Consular Affairs Visa Office. (*Id.* ¶¶ 19–20.) Because of those feared consequences, Doe is "too scared to leave [his] home to see friends or purchase groceries." (*Id.* ¶ 24.) He states that "[t]his disruption has caused irreparable harm to both [his] academic trajectory and personal well-being, undermining years of effort and jeopardizing the continuation of [his] education." (*Id.*)

## C. Procedural History

On April 17, 2025, Doe filed a complaint for declaratory and injunctive relief against Defendants in this court. (*See* Compl.) His six-count complaint challenges both the termination of his F-1 status in SEVIS and the revocation of his visa. Counts 1, 3, and 4 allege that the termination of his SEVIS record violated the Administrative Procedure Act ("APA").

Count 1 alleges that the termination should be set aside under 5 U.S.C. § 706(2) because it was not in accordance with law, in excess of statutory authority, and without observance of procedure required by law. (*Id.* ¶¶ 41–44.) Count 3 alleges that the termination of his SEVIS record violated the APA's procedural due process provision, 5 U.S.C. § 706(2)(B). (*Id.* ¶¶ 50–52.) Count 4 asks the court to set aside the termination as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2) because Defendants failed to articulate any factual basis for the decision. (*Id.* ¶¶ 53–56.)

Count 2 of the complaint alleges that the termination of Doe's SEVIS record violated his due process rights under the Fifth Amendment. (*Id.* ¶¶ 45–49.) Counts 5 and 6 challenge the revocation of Doe's F-1 visa. Count 5 asserts that the visa revocation violated his due process rights, (*id.* ¶¶ 57–59), and Count 6 alleges that the visa revocation was arbitrary and capricious in violation of the APA, (*id.* ¶¶ 60–62).

The same day he filed his complaint, Doe moved for a temporary restraining order. (Dkt. 5.) His motion sought emergency injunctive relief against the termination of his F-1 status and SEVIS record and consequences that might flow from the termination. Doe did not ask the court for temporary injunctive relief related to the revocation of his visa. (*See* Pl.'s Mem. in Supp. of Mot. for TRO at 3 (Dkt. 5-1).)

The court granted an *ex parte* temporary restraining order at approximately 10:35 p.m. on April 17, 2025. (Dkt. 8.) The order temporarily enjoined Defendants from terminating Doe's F-1 status under SEVIS; ordered that Defendants' prior termination of his SEVIS record had no legal effect; and enjoined Defendants from arresting or detaining Doe, transferring him out of this court's jurisdiction, removing him from the United States, or

taking any other action as the result of the decision to terminate his F-1 status records from
SEVIS. (*Id.* at 2.) On April 21, 2025, Defendants reactivated Doe's SEVIS record to comply
with the court's order. (Decl. of Andre Watson ¶ 10.)

When it issued the temporary restraining order, the court informed the parties that it
would convert Doe's motion for a temporary restraining order to a motion for a preliminary
injunction and set an expedited briefing schedule. (Dkt. 8 at 2.) Defendants filed a response
in opposition to a preliminary injunction, along with multiple supplemental exhibits, and Doe
filed a reply. The court held a preliminary injunction hearing on May 1, 2025. Later that day,
the court extended the temporary restraining order for a period of fourteen days to ensure it
had time to fully consider the parties' submissions and arguments on the preliminary
injunction motion. (Dkt. 26.)

When it extended the temporary restraining order, the court also ordered the parties to
meet and confer to determine whether Defendants would agree to conditions that would
provide satisfactory relief to Doe while this litigation is ongoing. (*Id.*) On May 8, 2025, the
parties filed separate status reports confirming they were unable to reach an agreement that
would eliminate the need for a ruling on Doe's preliminary injunction motion. (Dkts. 30, 31.)

## D. New ICE Policy for Terminating SEVIS Records

While Doe's preliminary injunction motion was pending, Defendants informed the
court that ICE had promulgated a new policy governing the termination of SEVIS records.[5]

---

[5] On April 25, 2025—one day before ICE implemented the new policy—Defendants notified the court that ICE was
developing a new policy framework for terminating SEVIS records. (Dkt. 17 at 2.) They also stated that Doe's SEVIS
record would remain active until the new policy went into effect. (*Id.*) Defendants argued that those developments
eliminated the need for injunctive relief and mooted Doe's claims challenging the April 4, 2025 termination of his SEVIS
record. (*Id.*) The court denied the motion because Defendants did not file any materials that indicated what effect, if any,
the new policy framework would have on Doe's SEVIS record. (Dkt. 20.)

(Dkt. 22.)  The new policy, which was distributed to SEVP personnel on April 26, 2025, states that "[a] terminated record in SEVIS could indicate that the nonimmigrant no longer maintains F or M status."  (SEVIS Notice – Policy Regarding Termination of Records at 1 (Dkt. 22-1) [hereinafter "New SEVIS Policy"].)  At the same time, it states that "termination does not always result in an adverse impact on the student" and notes that "DSOs and SEVP can terminate records for several normal, administrative reasons."  (*Id.*)

The policy goes on to identify a list of reasons for terminating SEVIS records, which it makes clear are non-exhaustive.  Those reasons include "Evidence of a Failure to Comply with the Terms of Nonimmigrant Status Exists" and "U.S. Department of State Visa Revocation (Effective Immediately)."  (*Id.*)  The policy includes additional guidance on the effect of visa revocations.  It states:

> Pursuant to INA § 221(i), the U.S. Department of State (State) may at any time, in its discretion, revoke an alien's visa.  State can consider derogatory information provided by ICE and other U.S. law enforcement agencies in its assessment of whether visa revocation is appropriate for an alien.  When State revokes an alien's visa with immediate effect, ICE should take steps to initiate removal proceedings.

> If State revokes a nonimmigrant visa effective immediately, SEVP may terminate the nonimmigrant's SEVIS record based on the visa revocation with immediate effect, as such a revocation can serve as a basis of removability under INA § 237(a)(1)(B).  SEVP should not, however, terminate a nonimmigrant's SEVIS record on this basis until it has confirmed that State has revoked the visa.

(*Id.* at 2.)  The policy does not expressly address the effect of prudential visa revocations.

## II.    Standard of Review

Federal Rule of Civil Procedure 65(a) authorizes courts to issue preliminary injunctions.

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). The court may grant a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A preliminary injunction is "never awarded as of right." *Id.* at 24.

A plaintiff seeking a preliminary injunction must demonstrate (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm without preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Id.* at 20. The court must separately consider each *Winter* factor. *Di Biase*, 872 F.3d at 230. To satisfy the first factor, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Id.* (internal quotation marks omitted). To satisfy the second, "a plaintiff must demonstrate more than just a 'possibility' of irreparable harm." *Id.* The third and fourth factors "merge" where, as here, the Government is the opposing party. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## III.    Analysis

### A. Discussion of Preliminary Injunction Factors

Based on the parties' submissions and their arguments at the May 1, 2025 preliminary injunction hearing, the court finds that each of the four *Winter* factors favors an award of

preliminary injunctive relief to maintain the status quo while Doe's lawsuit is ongoing. An analysis of each factor follows.

    1.  <u>Likelihood of success on the merits</u>

Doe argues that the termination of his SEVIS record violated both the APA (Counts 1, 3, and 4) and the Due Process Clause of the Fifth Amendment (Count 2). When a complaint alleges multiple causes of action, a plaintiff need only show a likelihood of success on one claim to justify preliminary injunctive relief. *See Abrego Garcia v. Noem*, -- F. Supp. 3d --, 2025 WL 1014261, at *9 (D. Md. Apr. 6, 2025); *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 505 (E.D. Va. 2021); *Nabisco Brands, Inc. v. Conusa Corp.*, 722 F. Supp. 1287, 1292 n.4 (M.D.N.C.), *aff'd*, 892 F.2d 74 (4th Cir. 1989) (table decision).

As it did when considering Doe's motion for a temporary restraining order, the court will focus on whether Doe is likely to establish a violation of the APA—specifically, that the April 4, 2025 termination of his SEVIS record was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). Defendants argue that Doe cannot establish a likelihood of success under the APA because the APA's waiver of sovereign immunity does not extend to claims challenging the termination of SEVIS records. They also suggest that Doe's APA claims fail because other adequate remedies exist. Neither argument is persuasive, and Doe has shown a clear likelihood that the termination of his SEVIS record violated the APA.

    *i.  Doe's APA claims are not barred by sovereign immunity.*

Sovereign immunity is jurisdictional in nature and, unless waived by the federal government, shields the government and its agencies from suit. *FDIC v. Meyer*, 510 U.S. 471,

475 (1994). "[T]he terms of [the United States's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). The plaintiff bears the "burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to his particular claim." *Lancaster v. Sec'y of the Navy*, 109 F.4th 283, 293 (4th Cir. 2024) (quoting *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005)).

The APA waives sovereign immunity for actions in federal court brought by "person[s] suffering legal wrong because of agency action." 5 U.S.C. § 702. Section 702 sets certain limitations on the scope of that waiver. To fall within the statutory waiver of sovereign immunity, the action must "seek[] relief other than money damages." *Id.* In addition, Section 702 does not "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* A statute forbids relief under the APA when it provides the exclusive remedy for the claim in question. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012). As the Supreme Court has explained, "[w]hen Congress has dealt in particularity with a claim and has intended a specified remedy—including its exceptions—to be exclusive, that is the end of the matter; the APA does not undo the judgment." *Id.* (cleaned up).

Defendants argue that the Privacy Act of 1974 is one such statute. That Act, they contend, provides the exclusive means of challenging the termination of a governmental record like a SEVIS record and therefore precludes Doe from seeking relief under the APA. This argument is unconvincing and overlooks contrary Supreme Court precedent. The U.S. District Court for the District of Columbia's recent opinion in *Alliance for Retired Americans v.*

*Bessent*, -- F. Supp. 3d --, 2025 WL 740401 (D.D.C. Mar. 7, 2025), is instructive on this point. There, the court held that the Privacy Act does not impliedly forbid related forms of relief under the APA. *Id.* at *18–19. It noted that the Supreme Court's decision in *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024), "suggests that the Privacy Act is not the kind of comprehensive and 'exclusive' remedial statute that impliedly displaces related remedies under other statutes." *All. for Retired Ams.*, 2025 WL 740401, at *19. In *Kirtz*, the Supreme Court rejected an argument that the Privacy Act's remedies for the improper retention or disclosure of personal information indicated that similar remedies were not available under the Fair Credit Reporting Act. *See Kirtz*, 601 U.S. at 63. Relying on the reasoning in *Kirtz*, the District of Columbia concluded that "Congress did not intend for the Privacy Act to be an 'exclusive' source of claims or remedies for alleged mishandling of records about individuals that impliedly forbids other relief under the APA." *All. for Retired Ams.*, 2025 WL 740401, at *19.

Defendants fail to explain how the Supreme Court's reasoning in *Kirtz* is not applicable here. Instead, they claim it is "well-settled that the Privacy Act is a comprehensive statutory scheme that precludes other avenues of relief." (Defs.' Mem. at 8.) But neither of the two decisions they cite addressed whether the Privacy Act precludes any APA claim that implicates records maintained by federal agencies. *See Wilson v. Libby*, 535 F.3d 697, 708–09 (D.C. Cir. 2008) (holding that the Privacy Act precluded a constitutional *Bivens* remedy); *Chichakli v. Kerry*, 203 F. Supp. 3d 48, 52 (D.D.C. 2016) (stating that claims arising from the improper *disclosure* of personal information needed to be brought under the Privacy Act). In any event, both decisions predate the Supreme Court's decision in *Kirtz*, which clarified that the remedies

- 15 -

provided by the Privacy Act may coexist with similar remedies provided by other federal statutes. And even before its decision in *Kirtz*, the Supreme Court recognized that the APA may provide injunctive remedies the Privacy Act does not address. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004) ("The Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of adverse determinations or effects, although it may be that this inattention is explained by the general provisions for equitable relief within the Administrative Procedure Act . . . .").

In short, there is no basis for holding that the Privacy Act impliedly forbids APA claims challenging the termination of an international student's SEVIS record.[6] Several other courts have recently reached the same conclusion. *See, e.g., Isserdasani v. Noem*, No. 25-cv-283, 2025 WL 1330188, at *5 (W.D. Wis. May 7, 2025); *Doe #1 v. Noem*, No. 25-cv-926, 2025 WL 1194080, at *5 (S.D. Cal. Apr. 24, 2025); *Madan B.K. v. Noem*, No. 1:25-cv-419, 2025 WL 1171572, at *5 (W.D. Mich. Apr. 23, 2025); *Chen v. Noem*, No. 1:25-cv-00733, 2025 WL 1163653, at *4–5 (S.D. Ind. Apr. 21, 2025). Doe's APA claims therefore fall within the waiver of sovereign immunity in § 702, and this court may exercise jurisdiction over them.

### ii. Doe's claims satisfy the APA's other requirements for judicial review.

Section 704 of the APA authorizes judicial review of a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Defendants do not contest

---

[6] While the court need not reach the issue, it is also doubtful that the Privacy Act even "deal[s] in particularity" with claims challenging the termination of a SEVIS record. *Patchak*, 567 U.S. at 216. The Privacy Act authorizes civil actions against federal agencies that "fail[] to maintain any record concerning any individual with such accuracy . . . as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record." 5 U.S.C. § 552a(g)(1)(C). An agency's deliberate termination of a record is quite different than a mere "fail[ure] to maintain" accurate records. *See Isserdasani v. Noem*, No. 25-cv-283, 2025 WL 1330188, at *5 (W.D. Wis. May 7, 2025); *Doe v. Noem*, No. 5:25-cv-00847, 2025 BL 141098, at n.1 (C.D. Cal. Apr. 25, 2025).

that the termination of Doe's SEVIS record qualifies as a "final agency action" under § 704,[7] but they argue that his APA claims are not reviewable because the Privacy Act provides an "other adequate remedy." (Defs.' Mem. at 9–10.)

This argument defies logic. "An alternative remedy will not be adequate under § 704 if the remedy offers only 'doubtful and limited relief.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988)). Here, relief under the Privacy Act is not merely "doubtful and limited"—it is categorically unavailable. The Privacy Act authorizes two classes of "individual[s]" to bring civil actions: U.S. citizens and lawful permanent residents. 5 U.S.C. § 552a(a)(2), (g)(1). Defendants themselves acknowledge that the Privacy Act "precludes review [here] because Doe is not a U.S. citizen or lawful permanent resident." (Defs.' Mem. at 9.) In fact, no student with F-1 status could *ever* even bring a civil action, let alone obtain relief under the Privacy Act, as a student with F-1 status is, by definition, not a permanent legal resident. Other courts have consistently recognized that the Privacy Act does not provide an adequate remedy to plaintiffs who are not authorized to sue under the Act, including students with F-1 status. *See Doe v. Noem*, No. 2:25-cv-01103, 2025 WL 1134977, at *4–5 (E.D. Cal. Apr. 17, 2025); *Doe*, 2025 WL 1194080, at *5–6; *Doe v. Trump*, No. CV-25-00174, 2025 WL 1192826, at *4 (D. Ariz. Apr. 24, 2025). And even if Doe were an authorized plaintiff, the Privacy Act would not provide an adequate remedy because

---

[7] Even if Defendants had contested this issue, the court would hold that the termination of Doe's SEVIS record is a final agency action reviewable under the APA. Several courts in other jurisdictions have reached the same conclusion, and this court finds their reasoning persuasive. *See, e.g., Jie Fang*, 935 F.3d at 182; Prelim. Inj. Order & Op., *Doe 1 v. Bondi*, No. 1:25-cv-01998, slip op. at 18–20 (N.D. Ga. May 2, 2025); *Doe v. Noem*, -- F. Supp. 3d --, 2025 WL 1141279, at *3 (W.D. Wash. Apr. 17, 2025); *Patel v. Bondi*, No. 1:25-CV-00101, 2025 WL 1134875, at *2 (W.D. Pa. Apr. 17, 2025); *Doe v. Noem*, No. 2:25-cv-01103, 2025 WL 1134977, at *5 (E.D. Cal. Apr. 17, 2025).

it "does not allow courts to grant injunctive or declaratory relief," which Doe seeks in this case. *Doe v. Chao*, 435 F.3d 492, 504 (4th Cir. 2006).

Because the Privacy Act does not provide another adequate remedy here, the court concludes that Doe may seek judicial review under the APA.

> *iii. Doe has made a clear showing that the April 4, 2025 termination of his SEVIS record likely violated the APA.*

As noted above, Doe alleges that the April 4, 2025 termination of his SEVIS record was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). (Compl. ¶¶ 53–56.) Based on the facts available at this stage, Doe is almost certain to prevail on this claim.

Defendants concede that they had no lawful justification for terminating Doe's F-1 status under the relevant regulations. They admit that Doe's SEVIS record was terminated because of his dismissed misdemeanor battery charge from 2015. (*See* Decl. of Andre Watson ¶¶ 7–8.) That charge clearly fails to meet the definition of "criminal activity" that constitutes a failure to maintain F-1 status because Doe was never convicted of the offense and, even if he had been, the offense was not punishable by at least one year of imprisonment. *See* 8 C.F.R. § 214.1(g). At the preliminary injunction hearing, Defendants' counsel agreed that the 2015 charge was not a valid reason to terminate Doe's F-1 status. (Tr. of Prelim. Inj. Hr'g at 20:12–15 (Dkt. 29).) Counsel also agreed that the prudential revocation of Doe's visa was not a valid reason for terminating his F-1 status under the regulations. (*Id.* at 16:16–22.)

Instead, Defendants claim that they never actually terminated Doe's F-1 status. (Defs.' Mem. at 6.) They assert that SEVP merely terminated Doe's *SEVIS record*, and that

"[t]erminating a record in SEVIS does not terminate an individual's nonimmigrant status in the United States."  (Decl. of Andre Watson ¶ 11.)

This *post-hoc* distinction offends common sense.  In fact, it appears Defendants have invented this distinction to avoid responsibility for an obvious attempt to communicate that Doe had lost F-1 status.  It is implausible to suggest that the April 4, 2025 update to Doe's SEVIS record had no implications for his F-1 status.  That update communicated in quite clear terms that Defendants terminated Doe's SEVIS record *because* his F-1 status was terminated. As of that date, Doe's SEVIS record identified him as an "F-1 Student" and listed his "Status" as "TERMINATED."   (Decl. of Seth Hall ¶ 3 (Dkt. 5-4).)   The "TERMINATION REASON" provided read: "OTHERWISE FAILING TO MAINTAIN STATUS – Individual identified in criminal records check and/or has had their VISA revoked."  (*Id.*) Only after providing that information did the April 4, 2025 update state: "SEVIS record has been terminated."  (*Id.*)   The termination reason contains the exact same language the regulations use when identifying grounds for losing F-1 status.  *See* 8 C.F.R. § 214.1(g) (stating that "criminal activity," as defined by the regulation, "constitutes a failure to maintain [F-1] status").   When asked about the "failing to maintain status" language at the preliminary injunction hearing, Defendants' counsel conceded that it was an apparent reference to Doe's F-1 status.  (Tr. of Prelim. Inj. Hr'g at 16:10–12.)

DHS's published guidance on the termination of SEVIS records further reinforces this conclusion.[8]  It explains that the termination reason "Otherwise Failing to Maintain Status"—

---

[8] The court may take judicial notice of this guidance, which is published on a website managed by DHS.  *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 255 n.3 (4th Cir. 2018).

the one used in Doe's case—applies when "[t]he student has not maintained status" and "[n]one of the other terminations [sic] reasons applies."  DHS, *Termination Reasons*, SEVIS Help Hub, https://perma.cc/8VB9-SPFB (last updated Apr. 9, 2025).  Other DHS guidance similarly states that a SEVIS record should be terminated when "[t]he student did not maintain [F-1] status per regulations."  DHS, *Terminate a Student*, SEVIS Help Hub, https://perma.cc/5P7C-5BCB (last updated Nov. 7, 2024); *see also id.* ("A terminated record in [SEVIS] could indicate that the nonimmigrant no longer maintains F or M status.").

Defendants now claim that the April 4, 2025 update to Doe's SEVIS record did not mean what it said.  They say the update was merely a "flag" that Doe *might* have failed to maintain status, which they issued to start a "dialogue" with the University of Virginia.  (*See* Tr. of Prelim. Inj. Hr'g at 12:5–14, 17:10–15.)  Defendants have submitted a transcript from a hearing in a similar case in which Andre Watson, the Assistant Director for ICE, offers the same explanation for the thousands of SEVIS records ICE terminated in recent weeks.  (Tr. of Hr'g on Prelim. Inj. or Summ. J., *Patel v. Lyons*, No. 1:25-cv-01096, at 28:23–29:1, 31:22–33:14 (D.D.C. Apr. 29, 2025) (Dkt. 23-1).)

This explanation does not withstand the slightest scrutiny.  Defendants admit they amended Doe's SEVIS record based on National Crime Information Center ("NCIC") records for the 2015 misdemeanor battery charge, and that those "records indicated that the charge was expunged."  (Decl. of Andre Watson ¶¶ 7–8.)  They would have had no legitimate reason to "flag" an expunged charge they already knew had no impact on Doe's lawful status.[9]

---

[9] Defendants suggest that the update to Doe's SEVIS record also communicated to the University that his visa may have been revoked.  (Tr. of Prelim. Inj. Hr'g at 17:6–9.)  That explanation, too, is very difficult to square with the references to the termination of Doe's F-1 status.  Again, Defendants have acknowledged that the prudential revocation of Doe's visa

The references to the termination of Doe's F-1 status in the April 4, 2025 SEVIS update further discredit the notion that Defendants sought only to start a "dialogue" with University officials.  Even if a student's SEVIS record may be terminated for other reasons in some cases, the record overwhelmingly suggests that Defendants terminated Doe's SEVIS record *based on* a purported finding that he had failed to maintain F-1 status.

As a last resort, Defendants maintain that they never terminated Doe's F-1 status because they had no lawful justification for doing so.  They point out that none of the three exclusive "triggers" for termination of status in 8 C.F.R. § 214.1(d) occurred here.  (Defs.' Mem. at 6.)  Their declarant similarly states that "[t]he statute and regulations do not provide SEVP the authority to terminate nonimmigrant status by terminating a SEVIS record, and SEVP has never claimed that it had terminated DOE's nonimmigrant status."  (Decl. of Andre Watson ¶ 11.)  But Doe filed this lawsuit precisely because he believes Defendants acted beyond the bounds of their lawful authority.  And whether SEVP has "claimed" responsibility for terminating Doe's F-1 status, the facts show that the termination of Doe's SEVIS record likely had that effect, as communicated clearly through the language SEVP used when updating Doe's SEVIS record.

In short, the existing facts demonstrate that Defendants effectively terminated Doe's F-1 status via the April 4, 2025 update to his SEVIS record.  Other courts have concluded that very similar updates to SEVIS records likely had the same effect.  *See Isserdasani*, 2025 WL

---

does not trigger a loss of F-1 status under 8 C.F.R. § 214.1.  (*Id.* at 16:16–22.)  The court also notes that the record does not contain any evidence confirming that the Department of State prudentially revoked Doe's visa prior to April 4, 2025. Doe first learned of the purported revocation via the email he received from the Bureau of Consular Affairs Visa Office on April 10, 2025.  (*See* Decl. of Doe ¶ 15.)  And Watson's declaration states that DHS first received notice of the revocation on April 16, 2025.  (Decl. of Andre Watson ¶ 9.)

1330188, at *6 (rejecting defendant's attempt to distinguish the termination of a SEVIS record from the termination of F-1 status as "semantics"); *Chen*, 2025 WL 1163653, at *7; *Hinge v. Lyons*, No. 25-1097, 2025 WL 1134966, at *4 & n.10 (D.D.C. Apr. 15, 2025). Because it is undisputed that Defendants had no lawful reason under § 214.1 to find that Doe had lost F-1 status, Doe has made a clear showing that he likely will succeed in establishing that the termination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

2. Irreparable harm

To satisfy the irreparable-harm element, Doe must make a "clear showing" that, without injunctive relief, he will "suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). An injury qualifies as irreparable when it "cannot be fully rectified by the final judgment after trial." *Id.* (citation omitted).

The court finds that Doe has made a clear showing of irreparable harm. The April 4, 2025 termination of his SEVIS record and his apparent loss of F-1 status has caused several different forms of harm. For one, it has prevented him from attending in-person classes for his graduate program, which negatively impacts his grades and places him at risk of losing his scholarship. (Decl. of Doe ¶ 21.) The termination of Doe's SEVIS record and resulting uncertainty about his authorization to work in the United States also has interfered with his ability to obtain a summer internship, which is an integral component of his graduate program. (*Id.* ¶ 22.) Doe took out substantial loans to complete his graduate course of study, and he

will face "extremely difficult" financial consequences if he is unable to complete the program.[10]  (*Id.* ¶ 21.)  Courts have recognized that similar disruptions to academic progress caused by the termination of students' SEVIS records support a finding of irreparable harm. *See, e.g.*, Prelim. Inj. Order and Op., *Doe 1 v. Bondi*, No. 1:25-cv-01998, slip op. at 26–28 (N.D. Ga. May 2, 2025); *Isserdasani*, 2025 WL 1330188, at *8; *Doe v. Noem*, -- F. Supp. 3d --, 2025 WL 1141279, at *8 (W.D. Wash. Apr. 17, 2025).  In addition, Doe reports that he is experiencing high levels of stress and anxiety due to the uncertainty about his legal status.  (*Id.* ¶ 24.)  He explains that his "entire academic identity is rooted in the path [he has] built here in the United States" through years of effort, "and the possibility of losing that feels overwhelming and deeply unsettling."  (*Id.* ¶¶ 18, 24.)

Doe also fears that he will be detained and deported before he can complete his course of study.  (*Id.* ¶¶ 17–20, 24.)  While Defendants try to argue otherwise, the available evidence shows that his fears are far from speculative.  The email he received from the Bureau of Consular Affairs Visa Office shortly after Defendants terminated his SEVIS record makes that much clear.  The email warned him that "[r]emaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation"; that "deportation can take place at a time that does not allow the person being deported to secure possessions or

---

[10] Because money damages are not recoverable in this case, *see* 5 U.S.C. § 702, Doe's threatened financial losses can support a finding of irreparable harm.  *See Doe 1*, slip op. at 28–29 (holding that loss of scholarships and other monetary losses students would suffer due to SEVIS terminations constituted irreparable harm because they were not recoverable under the APA); *see also Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 500 (D. Md. 2020) (holding that "severe economic losses can qualify as irreparable harm" because "no monetary damages are available" under § 702); *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) ("[I]f a movant seeking a preliminary injunction will be unable to sue to recover any monetary damages against a government agency in the future because of, among other things, sovereign immunity, financial loss can constitute irreparable injury.") (internal quotation marks omitted).  Because the APA does not waive sovereign immunity for actions seeking monetary damages, this is not a case "[w]here the harm suffered by the moving party may be compensated by an award of money damages at judgment."  *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).  Ultimately, however, the court would find that Doe has made a clear showing of irreparable harm even if it did not consider the threatened financial injuries.

conclude affairs in the United States"; and, most alarmingly, that "[p]ersons being deported may be sent to countries other than their countries of origin." (Pl.'s Ex. C at 2). After emphasizing "the gravity of the situation," the email concluded by encouraging Doe to self-deport. (*Id.*) It is hardly surprising that Doe is now "too scared to leave [his] home to see friends or purchase groceries." (Decl. of Doe ¶ 24.)

DHS's own public guidance confirms that Doe's fears are well-founded. It states that a student whose "F-1/M-1 SEVIS record" is terminated "loses all on- and/or off-campus employment authorization"; that a student "cannot re-enter the United States on the terminated SEVIS record"; and, most relevant here, that "[ICE] agents may investigate to confirm the departure of the student." DHS, *Terminate a Student*, SEVIS Help Hub, https://perma.cc/5P7C-5BCB (last updated Nov. 7, 2024).

While Defendants have made certain representations during this litigation, they do not mitigate the threat of injury in any meaningful way. Defendants say ICE "understands" that Doe currently is in lawful F-1 status, and they agree not to re-terminate his SEVIS record based solely on the expunged 2015 charge.[11] (Defs.' Status Report at 1–2 (Dkt. 30).) Those representations do little to assuage Doe's concerns, because in the next breath Defendants take the position that the new SEVIS policy gives ICE near-limitless discretion to terminate students' SEVIS records. (Tr. of Prelim. Inj. Hr'g at 28:2–29:2.) In fact, they assert that the new policy allows them to re-terminate Doe's SEVIS record as of today—although he continues to satisfy all conditions for maintaining F-1 status under 8 C.F.R. § 214.1. (*Id.* at

---

[11] The court appreciates Defendants' additional representation that ICE, after reactivating Doe's SEVIS record following the court's temporary restraining order, made the reactivation retroactive to April 4, 2025, to ensure there is no gap in his record. (Defs.' Status Report at 2 (Dkt. 30).)

27:16–19.)  Because the termination reasons listed in the new policy are not exhaustive, (*see* New SEVIS Policy), nothing prevents Defendants from immediately re-terminating Doe's SEVIS record based on the prudential revocation of his visa or some other reason that conflicts with the regulations governing F-1 status.  (*See* Tr. of Prelim. Inj. Hr'g at 28:15–19.)

Defendants also say "there would be no indication that upon [an] individualized review, [Doe] would have his SEVIS status re-terminated."  (*Id.* at 30:7–10.)  Given the events that led to this lawsuit, though, there is reason to doubt whether Defendants intend to conduct individualized reviews of student records before making termination decisions.  Further, it is difficult to put much stock in this representation when Defendants also claim the authority to re-terminate Doe's SEVIS record as soon as the temporary restraining order expires.  Notably, Defendants would not agree to refrain from re-terminating Doe's SEVIS record unless one of the grounds for terminating F-1 status identified in the regulations applied.  (*See id.* at 31:15–22; Defs.' Status Report at 1–2.)  And as Doe points out, a senior DHS official recently stated that students whose status is temporarily restored "could still very well have it terminated in the future, along with their visas."  (Doe's Reply Mem. in Supp. of Mot. for Prelim. Inj. at 5–6 (Dkt. 21) (quoting Zach Montague and Hamed Aleaziz, *U.S. Restores Legal Status for Many International Students, but Warns of Removals to Come*, N.Y. Times (Apr. 25, 2025), https://www.nytimes.com/2025/04/25/us/politics/trump-student-visa-cancellations.html.).)

Instead of agreeing not to re-terminate Doe's SEVIS record during the pendency of this litigation, Defendants resort to a familiar argument.  They suggest that any re-termination would not cause irreparable harm because the termination of a SEVIS record "has no bearing

- 25 -

on nonimmigrant status." (Defs.' Status Report at 2.) For the reasons already discussed, that argument lacks support in the record or in DHS's own public-facing guidance. *See* DHS, *Terminate a Student*, SEVIS Help Hub, https://perma.cc/5P7C-5BCB (last updated Nov. 7, 2024) (stating that "[ICE] agents may investigate to confirm the departure of the student" when the student's SEVIS record is terminated); *see also Doe 1*, slip op. at 6–7 (noting that students without an active SEVIS record "effectively have no legal status and therefore face uncertainty about being able to attend classes, graduate, obtain and maintain employment, and keep housing and insurance"). Defendants themselves have confirmed that Doe does not have access to any other database that would enable him to confirm whether his F-1 status is active. (Defs.' Suppl. Filing at 1.) Thus, a re-termination of Doe's SEVIS record likely would create the same harmful uncertainty about his lawful presence in the United States, his potential accrual of unlawful presence time, and the threat of deportation.

Finally, the fact that the Department of State has prudentially revoked Doe's F-1 visa places him in a particularly vulnerable position. Defendants acknowledge that DHS initiated the visa revocation process by sending Doe's NCIC criminal history records to the Department of State, but they emphasize that the Department of State has complete discretion over visa revocations and is not a party to this action. (*See* Tr. of Prelim. Inj. Hr'g at 13:7–15:2.) That may well be true. But if DHS is in the business of sharing records with the Department of State for the obvious purpose of facilitating visa revocations, the court presumes that DHS can also inform the Department of State when those records did not in fact provide lawful grounds for terminating F-1 status. The fact that Defendants seem uninterested in even suggesting that the Department of State reconsider its decision to

- 26 -

prudentially revoke Doe's visa raises concerns that they plan to rely on that revocation to re-terminate his SEVIS record. They have already asserted that the new policy allows them to do just that. (*Id.* at 28:15–19.)

In short, while Defendants reinstated Doe's SEVIS record to comply with this court's temporary restraining order, Doe has very real reason to fear that they will re-terminate his record as soon as that order expires. The new SEVIS policy purports to give Defendants even broader discretion to terminate SEVIS records, even when the student has maintained F-1 status under the regulations. Further, Defendants have not offered any persuasive support for their claim that re-terminating Doe's SEVIS record would not impact his F-1 status. Based on the serious threat of re-termination—and the serious consequences that would result—the court finds that Doe has made a clear showing that a preliminary injunction is necessary to prevent irreparable harm.

3.  Balancing of equities and public interest

The third and fourth factors, which ask the court to balance the equities and weigh the public interest in preliminary injunctive relief, "merge when the Government is the opposing party." *Miranda*, 34 F.4th at 365 (quoting *Nken*, 556 U.S. at 435). A court "should pay particular regard for the public consequences" of a preliminary injunction. *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Here, the balance of harms weighs heavily in Doe's favor. Doe faces immediate and severe consequences if his SEVIS record is terminated, including a loss of his lawful status and access to his graduate program, damage to his career prospects, significant financial losses, and deportation. Those harms outweigh any minimal hardship Defendants will face if the

court enjoins them from terminating Doe's SEVIS record or taking any other action inconsistent with his F-1 status while this litigation is ongoing.

Defendants argue that a preliminary injunction would interfere with the Executive Branch's "sovereign prerogative" to control immigration. (Defs.' Mem. at 16 (quoting *El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Rev.*, 959 F.2d 742, 750 (9th Cir. 1991)).) While the Executive Branch has broad authority to enforce immigration laws, there is no public interest in allowing government officials to violate applicable regulations. *See, e.g., Ajugwe v. Noem*, No. 8:25-cv-982, 2025 WL 1148689, at *3 (M.D. Fla. Apr. 18, 2025); *Ratsantiboon v. Noem*, No. 25-CV-01315, 2025 WL 1118645, at *3 (D. Minn. Apr. 15, 2025). Just as the Executive Branch has the authority to enforce immigration laws, the Judiciary has the power and responsibility to ensure that the Executive Branch's action is lawful and constitutional. This system of checks and balances is a cornerstone of American democracy, which exists to protect the public interest. Doe is not asking for relief that intrudes on the Executive Branch's power over immigration; he simply seeks a remedy from this court to ensure Defendants comply with the applicable laws and regulations when exercising that power. This court agrees that "there is substantial public interest in ensuring government agencies abide by federal laws even when they are pursuing their prerogatives." *Doe 1*, slip op. at 31–32; *see Doe*, 2025 WL 1141279, at *9.

*        *        *

For the reasons outlined above, the court concludes that Doe has sufficiently demonstrated that all four *Winter* factors favor preliminary injunctive relief.

**B. Scope of Preliminary Injunctive Relief**

To maintain the status quo during the pendency of this litigation, the court will enjoin Defendants from terminating or reversing the reinstatement of Doe's SEVIS record without further showing and approval by this court. The court will further enjoin Defendants from taking any direct or indirect action that is inconsistent with Doe maintaining lawful F-1 status in the United States—including detaining him or transporting him out of this court's jurisdiction based on a finding that he is out of status—unless Doe fails to maintain F-1 status for one of the reasons enumerated in 8 C.F.R. § 214.1.

Defendants argue that 8 U.S.C. § 1252(g) and 8 U.S.C. § 1226(e) prohibit the court from granting any injunctive relief that limits their power to detain or transport Doe. (Defs.' Mem. at 16.) After careful consideration of both statutes, the court concludes that neither applies here.

8 U.S.C. § 1252 authorizes judicial review of final orders of removal and limits the jurisdiction of courts to hear other claims arising from removal proceedings. Section 1252(g) states as follows:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

The Supreme Court has instructed courts to read § 1252(g) narrowly. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999). The provision "applies only to three discrete actions that the Attorney General make take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* at 482 (emphasis in original). The Supreme

Court has explained that limiting courts' jurisdiction to review those actions—"which represent the initiation or prosecution of various stages in the deportation process"—leaves room for the Executive Branch to exercise its "discretion to abandon the endeavor." *Id.* at 483.

Here, Doe does not ask the court to enjoin Defendants from initiating removal proceedings. Defendants nevertheless argue that an injunction temporarily limiting their power to detain Doe or transport him out of this jurisdiction violates § 1252(g) because it "is linked to the Attorney General's discretion to commence proceedings, as well as the conclusion of those proceedings." (Defs.' Mem. at 17.) They cite several Ninth Circuit decisions holding that § 1252(g) bars judicial review of decisions *when* to commence removal proceedings. *See, e.g., Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002); *Cortez-Felipe v. I.N.S.*, 245 F.3d 1054, 1057 (9th Cir. 2001).

The court is not persuaded that granting the injunctive relief Doe seeks will run afoul of § 1252(g). While § 1252(g) may apply to claims anticipating future removal proceedings, *see Reno*, 525 U.S. at 477, Doe's claims do not "aris[e] from" any past, present, or future "decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g). Rather, his claims stem from the decision to terminate his SEVIS record. While the SEVIS termination might lead to removal proceedings, the termination decision itself was not a decision or action covered by § 1252(g). *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (noting that the Supreme Court's decision in *Reno* rejected the notion that § 1252(g) "imposes a general jurisdictional limitation") (internal quotation marks omitted).

- 30 -

At least three other courts have held that § 1252(g) did not bar them from granting similar—and even more expansive—forms of injunctive relief in cases involving challenges to the termination of SEVIS records and/or F-1 status. *See Chen*, 2025 WL 1163653, at *8–10 (holding that § 1252(g) did not prohibit the court from temporarily enjoining removal proceedings because the plaintiff "d[id] not challenge a decision to commence removal proceedings and instead challenge[d] Defendants' termination of his SEVIS record and F-1 status"); *Doe*, 2025 WL 1134977, at *7–8 (holding that 1252(g) did not bar the court from temporarily enjoining detention and removal based on a SEVIS termination because the statute "does not divest courts of jurisdiction over cases that do not address prosecutorial discretion and address a purely legal question, which does not challenge the Attorney General's discretionary authority") (internal quotation marks omitted); *Ozturk v. Trump*, -- F. Supp. 3d -- -, 2025 WL 1145250, at *11–13 (D. Vt. Apr. 18, 2025) (holding that § 1252(g) did not apply when a student sought injunctive relief based on claims "challenging her apprehension, detention, and the termination of her SEVIS"); *see also Fornalik v. Perryman*, 223 F.3d 523, 532 (7th Cir. 2000) (holding that § 1252(g) did not apply because the plaintiff's claim was "not that the Attorney General is unfairly executing a removal order, but rather that a prior, unrelated error makes his removal improper").

Defendants next argue that 8 U.S.C. § 1226(e) prohibits injunctive relief that restricts their ability to detain Doe. Section 1226 governs the apprehension and detention of noncitizens. Section 1226(e) states that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of

any alien or the revocation or denial of bond or parole."  8 U.S.C. § 1226(e).  Section 1252(a)

similarly bars judicial review of "any . . . decision or action of the Attorney General . . . the

authority for which is specified under this subchapter [which includes § 1226(e)] to be in the

discretion of the Attorney General."  *Id.* § 1252(a)(2)(B)(ii).

Defendants cite several out-of-circuit cases to support their argument that § 1226(e)

applies here, but each of those cases addressed claims brought by noncitizens who were

already detained.  *See Van Dinh v. Reno*, 197 F.3d 427, 429 (10th Cir. 1999); *Avramenkov v. I.N.S.*,

99 F. Supp. 2d 210, 211 (D. Conn. 2000); *Mayorga v. Meade*, No. 24-cv-22131, 2024 WL

4298815, at *1 (S.D. Fla. Sept. 26, 2024); *Saadulloev v. Garland*, No. 3:23-cv-00106, 2024 WL

1076106, at *1 (W.D. Pa. Mar. 12, 2024); *Salazar v. Dubois*, No. 17-CV-2186, 2017 WL 4045304,

at *1 (S.D.N.Y. Sept. 11, 2017).  Doe, by contrast, has not been detained, so he does not seek

an order "set[ting] aside any action or decision by the Attorney General . . . regarding [his]

detention."  8 U.S.C. § 1226(e).  Rather, he asks the court to enjoin Defendants from detaining

him based on the termination of his SEVIS record and/or F-1 status, which, he has shown,

was likely unlawful under the APA.

Doe's claims challenging that termination decision implicate "the extent of the

Government's detention authority," which "is not a matter of 'discretionary judgment,'

'action,' or 'decision'" that § 1226(e) shields from judicial review. *Jennings v. Rodriguez*, 583 U.S.

281, 295–96 (2018) (plurality opinion); *see Demore v. Kim*, 538 U.S. 510, 516–17 (2003).  Thus,

§ 1226(e) does not bar an injunction preventing Defendants from detaining Doe based on an

unlawful termination of his SEVIS record and/or F-1 status.  *See Doe*, 2025 WL 1134977, at

*7–8 (reaching same conclusion); *Chen*, 2025 WL 1163653, at *10 (collecting cases in which

courts temporarily enjoined immigration officials from detaining international students whose SEVIS records were terminated).

Accordingly, the court concludes that it may enjoin Defendants from detaining Doe or transporting him outside this court's jurisdiction based on Defendants' finding that he is out of status, unless he fails to maintain his lawful F-1 status for one of the reasons enumerated in 8 C.F.R. § 214.1.

## C. Security

Finally, Defendants ask the court to require Doe to post security if it grants a preliminary injunction. Rule 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A "district court retains the discretion to set the bond amount as it sees fit or waive the security requirement" altogether, as long as it articulates the reasons for the waiver. *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013), *abrogated on other grounds by Winter*, 555 U.S. 7.

The court finds it appropriate to waive the security requirement in this case. Defendants do not identify any purpose security would serve, and there is no reason to believe a preliminary injunction will impose any significant financial burden on them.

## IV.    Conclusion

For the reasons outlined above, the court will **GRANT** Doe's motion for a preliminary injunction (Dkt. 5). A Preliminary Injunction Order will accompany this Memorandum Opinion.

**ENTERED** this __14th__ day of May, 2025.

_____
HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE